RUHL v. UNITED STATES.

No. 3044.

Circuit Court of Appeals, Tenth Circuit.

March 1, 1945.

William O. Wilson and Norman B. Gray, both of Cheyenne, Wyo., for appellant.

Carl L. Sackett, U. S. Atty., of Cheyenne, Wyo. (John C. Pickett, Asst. U.S. Atty., of Cheyenne, Wyo., on the brief), for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

Henry Ruhl, the appellant, was indicted, tried, and convicted of murder in the first degree in the District Court of the United States for the District of Wyoming. Under the mandatory provision of 18 U.S.C.A. § 454, he was sentenced to death. Thirteen assignments of error are urged as grounds for reversal. They can be summarized as follows:

1. The verdict of the jury is not sustained by competent evidence.

2. The court erred in overruling defendant's motion to suppress certain evidence.

3. Ruhl's confession was improperly admitted in evidence.

4. The court erred in admitting, over defendant's objections, Government's Exhibits 7, 8, 9, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 34, 39, 41, and 52.

5. The court erred in admitting certain testimony by Ed Wood.

The record in this case consists of 606 pages of transcribed testimony. In view of the severity of the penalty imposed, we have painstakingly and carefully read and scrutinized the entire record. In most instances we will refer to the testimony in

general terms. To quote in detail would result in an unreasonable and voluminous opinion and would serve no useful purpose.

### Verdict Not Supported by Evidence.

█ Ruhl was arrested in Englewood, Colorado, about 7:00 P.M., November 22, 1943. He was taken yet that night to Laramie, Wyoming, where he was lodged in jail. On November 24, 1943, he made a complete and detailed confession in which he admitted the murder and described in detail the manner in which the crime was committed. This confession was taken by the court reporter in shorthand, was transcribed, and presented to Ruhl on November 26, 1943, when he carefully read it in its entirety and then signed and verified it. The confession was admitted in evidence at the trial. If properly admitted, it amply sustains the verdict of the jury and the judgment of the court. For the reasons hereinafter set forth, we hold that the confession was properly admitted. But, aside from the confession, there was abundant other evidence warranting the verdict of guilty. It would serve no useful purpose to set it out in detail.

### Motion to Suppress.

██ Ruhl was arrested by Walter Byron, an officer employed by Albany County, Wyoming, to ferret out this crime. He was taken to the Englewood City Jail and from there to the City and County Jail of Denver. From there he went to his room for the purpose of getting his belongings preparatory to the trip to Laramie. He was accompanied to his room by Byron and by John G. Field and one Spiva, two city detectives. When the officers got to his room, they took possession of two suitcases belonging to him. They opened them and examined their contents. These contents were offered and received in evidence over the objections of appellant. This evidence was of such a nature that it no doubt was considered by the jury and tended to influence its verdict. Admittedly the officers had no search warrant at the time they seized these suitcases and took possession of these exhibits.

When this crime was first discovered, it was thought that it had occurred on ground subject to State jurisdiction. The State authorities undertook to solve it. It was a State officer who arrested Ruhl; it was a State officer and two City officers who made the search complained of. It was not until a considerable time after Ruhl had been removed to Laramie and had signed his confession that it was ascertained that the crime had been committed within the boundaries of a military reservation and that jurisdiction of the offense was in the Federal and not in the State government. No Federal officers participated in any manner in this search.

Even if we assume that the search was illegal, the evidence was nevertheless admissible. It is well settled that evidence obtained by State officers through an unreasonable or illegal search may nevertheless be used by the Federal government in a criminal case instituted in the Federal courts.[1] Under this well settled principle, this evidence was clearly admissible.

█ But the admissibility of this evidence need not be rested on this ground alone. It is, of course, axiomatic that one may consent to a search without a search warrant. The government's evidence tended to establish that while Ruhl was at the jail in Denver, he signed a waiver of extradition to Wyoming and consented to go there voluntarily; that he was asked about his luggage; that he replied that he had a room at the Republic Hotel and would take the officers over there to get his suit cases; that when they got to the hotel, he said there was no use to wait for the clerk, "Let's go on up." When they got to the room, one of the officers said he wanted to look through the suitcases, and Ruhl said, "Okay"; that when he was asked by one of the officers what was in the suitcases, he said, "Look and see." The court gave consideration to the motion to suppress this testimony in a preliminary hearing, and overruled the same. From the above evidence, the court was warranted in finding that Ruhl voluntarily consented to the search, and the evidence was properly admitted.

### The Confession.

It is urged that the court erred in admitting Ruhl's confession because it was not given freely and voluntarily, but was obtained by coercion and by use of methods which make it inadmissible under well established rules of law. The confession itself clearly establishes that his constitutional rights were guarded throughout. He was advised by the County Attorney of the

---

[1] Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048, 13 A.L.R. 1159; Feldman v. United States, 322 U. S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408.

gravity of the penalty for the offense with which he was charged; that it was his right to refuse to make a statement; that what he said would be used against him in the trial; and that no inducement was offered to obtain a statement from him. He was not subjected to long and exhausting examinations, physical abuses, or to any of the other so-called "third degree" methods which rightfully merit the condemnation of the courts. This is clearly established by his own testimony given at the preliminary hearing, held for the purpose of passing upon the admissibility of the confession. We repeat some of the questions and answers verbatim:

"Q. And you say you arrived in Laramie sometime between three and four o'clock in the morning? A. I think around three or three-thirty. I didn't have no watch.

"Q. You went up to bed? A. Yes.

"Q. You weren't questioned any that night? A. No.

"Q. And the following morning you weren't questioned, either, were you? A. No.

"Q. On the 24th? A. No, not on the 23rd.

"Q. Were you bothered by anyone? A. No.

"Q. Your cell was as comfortable as they usually get them in a jail? A. Oh, yes.

"Q. And you were fed the same as the other prisoners? A. Yes.

"Q. And then Byron talked to you that afternoon? A. Well, it wasn't in the afternoon. It was toward evening, not until they took me down to the office.

"Q. And Mr. Wood and Byron talked to you? A. No, it was Mr. Bell and Byron.

"Q. That was the afternoon of the morning that you arrived there? A. Yes.

"Q. Was that about the time you ate? A. No, it was 'way later than that. It was after twelve.

"Q. You didn't tell them much then? A. No.

"Q. Did they talk to you again that evening? A. Well, it was that evening when I talked to them.

"Q. They only talked to you once on the 23rd? A. Yes.

"Q. Then, the following morning, Byron came up to your cell again? A. Yes.

"Q. He was alone? A. Yes.

\* \* \* \* \* \*

"Q. From the time you arrived in the Albany County jail, and, in fact, from the time you were arrested in Englewood, you weren't mistreated in any way, were you? A. No, not as far as physically.

"Q. You weren't kept awake at nights? A. No.

"Q. Or questioned by relays of people in long periods of time? A. No.

"Q. The questioning was almost confined entirely to conversations with Byron until you made a more or less formal statement to Bell, isn't that right? A. Yes."

The jury was advised by appropriate instructions that the defendant contended that the confession had been obtained involuntarily and was therefore inadmissible, and that the jury should determine whether it had been given freely and voluntarily.

This presents an entirely different picture from conduct which the Supreme Court condemned in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, and in Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192, as a reading of those cases will clearly reveal. No useful purpose would be served by encumbering this opinion with a detailed narration of the factual situation in those cases which make the pronouncements there inapplicable in this case.

It is urged that the delay in filing charges against Ruhl made the confession inadmissible under the decision in the McNabb case, supra. The Supreme Court does stress the duty of arresting officers to immediately take a prisoner before an arraigning officer, and calls attention to the fact that the officers in that case failed to do this, and in the meantime obtained the confession. But a careful reading of the case leads to the conclusion that failure to take the accused before an arraigning officer was not the reason the confession was held inadmissible. The real basis of the decision was the coercive and unfair treatment to which the defendant was subjected.

We think the facts in this case are more like those in United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140. There the defendant was taken to the police station where he made an oral confession. It was eight days later before he was taken before a committing officer. It was urged that this made the confession inadmissible within the McNabb decision. The Supreme Court, however, held that the practices that

were condemned in the McNabb case were absent, and that the confession was properly admitted.

When Ruhl was arrested he had in his possession a letter written by a lady friend in Englewood. He claimed that the officers threatened to go to Englewood and arrest her if he did not confess, and that his desire to save her any embarrassment caused him to confess. He testified that she had no connection with the crime nor with any of his other infractions of the law. The officer who is accused of having made the threat specifically denied the charge. In any event, it is most difficult to believe that this threat, if it was made, would break down his will power to the extent that he would confess to a crime for which his life would be a forfeit, knowing all the time that she was innocent and could not be connected with the crime. That is especially so when we take into consideration that her letter advised him that their relations were at an end and that she would have no further association with him because of his past criminal record.

 No hard or fast rule can be laid down by which the admissibility of a confession may be determined with finality in every case. Every confession must be viewed in the light of all the surrounding facts and circumstances. It should be upheld only when it can be said from such an examination that it was given freely and voluntarily, and without threats, compulsion or use of force. We find no error in the admission of the confession.

### The Government's Exhibits.

Exhibits 7, 8, 9, 16, 17, 18, 19, 20 and 22 were obtained from Ruhl's suitcases as a result of the search at the time of his arrest. The objection to their introduction on the ground that the search was illegal is disposed of by our ruling on that point. It is further contended that they were improperly admitted because they had no relevancy. It is our conclusion that they had evidentiary value and were properly admitted on that account. While assignment of error was also predicated upon the admission of Government's Exhibits 23, 24, 25, 26, 34, 39, 41 and 52, any objection thereto has apparently been abandoned. No reference is made to these exhibits in the brief and they are not set out in the record nor called to our attention.

### Testimony of Ed Wood.

 It appears that about the time of the Katmo murder, a Mr. and Mrs. Cota, highly respected ranchers, were found murdered some distance south of the scene of the Katmo murder. Ruhl fled in the Katmo car. It bogged down about five miles from the Cota ranch, where he abandoned it. Three recently fired .32 caliber automatic cartridges, as well as some loaded shells suitable for use in one of the guns belonging to Ruhl, were found at the Cota ranch. There were also found there pieces of string similar to string found in his possession and in his suitcase, and similar to string with which the woman companion of Katmo was bound at the scene of the murder. When Sheriff Wood was on the stand, he testified that these articles were found at the Cota ranch. The admission of this evidence is urged as reversible error. It is urged that the Cotas were highly respected and that their murder was extremely abhorrent and was widely publicized throughout the state. It is argued that the admission of this evidence tended to inflame and prejudice the jury.

There was expert evidence that the exploded shells found at the Cota ranch were fired from Ruhl's gun. This evidence was admissible to prove flight, the course of flight, and tended to corroborate Ruhl's confession. No mention or reference was made by the Sheriff to the Cota murders. The only reference was to the Cota ranch where these things were found. This evidence was admissible even if we assume that the jury knew of the Cota murders and even if it is assumed that it tended to raise a suspicion in the minds of the jury that Ruhl might have been guilty of another crime, because it was competent in the case in which Ruhl was being tried.[2]

In view of the severity of the penalty, we have given careful consideration to every contention that is made, and have meticulously scrutinized the entire record. We find no reversible error therein.

The judgment is affirmed. Since the day fixed for the execution of the judgment and sentence has passed, the action is remanded with directions that the trial court cause the defendant to be brought before it and that it then fix a day for the execution of the judgment and sentence.

[2] Suhay v. United States, 10 Cir., 95 F.2d 890; Troutman v. United States, 10 Cir., 100 F.2d 628; Banning v. United States, 6 Cir., 130 F.2d 330.